UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 20-60372-CIV-MORENO

JORDAN CHELSEA BABCOCK,

   Plaintiff,

vs.

NEUTRON HOLDINGS, INC., a Delaware
Corporation *d/b/a* LIME,

   Defendant.
_____/

## ORDER GRANTING MOTION TO COMPEL ARBITRATION

This dispute is about the enforceability of an arbitration provision contained in a smartphone application contract to rent an electric scooter. To rent an "e-scooter" from Defendant Neutron Holdings, Inc. *d/b/a* Lime, Plaintiff Jordan Babcock created an account using Lime's smartphone application. In doing so, Babcock agreed to the User Agreement's terms—which include an Arbitration Provision that requires all disputes to be resolved in arbitration.

While riding the Lime e-scooter, Babcock lost control and sustained severe injuries. Instead of trying to arbitrate her dispute, Babcock filed in state court a single-count Complaint against Lime for negligence. Lime removed the case to federal court and moved to compel arbitration under the User Agreement. Babcock contests arbitration. She argues the Arbitration Provision is unenforceable under California law because the User Agreement did not put her on reasonable notice of the Arbitration Provision. Lime responds that Babcock had inquiry notice of the Arbitration Provision, as required by California law, and therefore her claim must be arbitrated.

THE COURT has considered the Motion to Compel, the Response in Opposition, the Reply, the pertinent portions of the record, and being otherwise fully advised in the premises, it is

**ADJUDGED** that the Motion to Compel Arbitration is **GRANTED**.

## I. BACKGROUND

### A. THE INCIDENT

On May 19, 2019, Plaintiff Jordan Babcock rented an electric scooter from Defendant Neutron Holdings, Inc. *d/b/a* Lime. (D.E. 1-2 at 7, ¶ 8.) Babcock rented the "e-scooter" by using the Lime smartphone application on her cell phone. *Id.* While "operating" the Lime e-scooter at or near the entrance of American Social, a bar and restaurant on Las Olas Boulevard in Fort Lauderdale, Babcock "suddenly lost control" and then "sustained severe personal injury." *Id.* at 7–8, ¶¶ 9–10. In a pre-suit demand letter asking for $300,000, Babcock states that she incurred $42,124.80 in medical bills, and asks for $10,000 for future medical expenses and $250,000 for pain and suffering, loss of enjoyment, mental anguish, and inconvenience. (*See* D.E. 1-3 at 3–4.)

### B. THE REGISTRATION PROCESS TO USE LIME E-SCOOTERS

Before a user can rent a Lime e-scooter, the user must download the Lime smartphone application (the "Lime App"). (*See* D.E. 8-1 at 2, Exhibit 1, Declaration of Bajurin at ¶ 2.) After downloading the Lime App, the user is prompted to create an account. In doing so, the user is prompted to agree to Lime's User Agreement and Terms of Service (the "User Agreement"). (*Id.* at 3, ¶¶ 9, 11.) Then, the user must enter a telephone number or use a Facebook link to populate their user information. (*See id.* at 6, Ex. A to Decl. of Bajurin, Image of User Information Screen.) After completing the user information inputs, the user is directed to a sign-up page with a notice that states: "By tapping 'I Agree', I confirm that I am at least 18 years old or other legal age of majority, and that I have read and agreed to Lime's **User Agreement** and that I have read **Privacy Note**." (*See id.* at 7, Ex. A to Decl. of Bajurin, Image of Sign-Up Screen (blue boldface in original).) The blue boldface "User Agreement" text is a hyperlink to the full terms of the User Agreement. (*See id.* at 3, Decl. of Bajurin at ¶ 12; *id.* at 9–61, Ex. B to Decl. of Bajurin, Copy of

Babcock's User Agreement with Lime.)

If the user dares to inquire into the full terms of the User Agreement, the user can tap the "User Agreement" hyperlink, which takes the user to a webpage containing the full terms. Otherwise, the user can proceed to rent an e-scooter by tapping "I Agree" on the sign-up page.

C.     **THE TERMS OF THE USER AGREEMENT**

If the user taps the "User Agreement" hyperlink, the first sentence of the first substantive paragraph instructs the user to carefully read the User Agreement and notifies the user that he or she is bound by the User Agreement's terms:

> **PLEASE READ EACH PROVISION OF THIS AGREEMENT CAREFULLY. IT SETS FORTH THE LEGALLY BINDING TERMS AND CONDITIONS FOR YOUR USE OF THE SERVICES (DEFINED BELOW). BY ACCESSING AND/OR USING OUR SERVICES, YOU AGREE TO BE LEGALLY BOUND BY THIS AGREEMENT**.

(*Id.* at 9, Ex. B to Decl. of Bajurin, Copy of Babcock's User Agreement with Lime (boldface and caps in original).)  The next sentence further warns the user to forgo using the service if the user does not agree with the arbitration provision:

> **IF YOU DO NOT AGREE TO THIS AGREEMENT AND THE CONDITIONS OF USE STATED HEREIN, INCLUDING THE ARBITRATION . . . PROVISION[], DO NOT USE THE SERVICES**.

(*Id.* (boldface and caps in original).)  If the user proceeds to read the Arbitration Provision set forth in Section 2.3 of the User Agreement, the user will learn that *all* disputes arising under the User Agreement *must* be resolved in arbitration:

> **2.3 <u>Binding Arbitration</u>: . . . ANY AND ALL DISPUTES . . . MUST BE RESOLVED BY FINAL AND BINDING ARBITRATION. . . . BY AGREEING TO ARBITRATE, EACH PARTY IS GIVING UP ITS RIGHT TO GO TO COURT AND HAVE ANY DISPUTE HEARD BY A JUDGE OR JURY.**

(*Id.* at 22 (boldface, underline, and caps in original).)  The Arbitration Provision further provides

that the Federal Arbitration Act governs the arbitrability of all disputes under the User Agreement:

> **The Federal Arbitration Act ("FAA"), not state law, shall govern the arbitrability of all Disputes regarding this Agreement . . . .**

(*Id.* (boldface in original).) Finally, the User Agreement also includes a Delegation Clause in Section 2.4, which provides that "**[a]ll issues are for the arbitrator to decide, including arbitrability**." (*Id.* at 23 (boldface in original).)

Like every user that rents a Lime e-scooter through the Lime App, Babcock tapped the "I agree" button, which confirmed that she "read and agreed to Lime's User Agreement." (*Id.* at 7, Ex. A to Decl. of Bajurin, Image of Sign-Up Screen; *id.* at 3, Ex. 1, Decl. of Bajurin at ¶¶ 9, 11.)

### D. THE PROCEDURAL HISTORY

Despite the Arbitration Provision, Babcock filed in state court a single-count Complaint alleging negligence against Lime. (*See* D.E. 1-2 at 6–10.) Babcock alleges that Lime owed her a duty to ensure that the e-scooter she used was safe to operate, and that Lime breached that duty by, among other reasons, failing to properly and timely inspect the subject e-scooter and failing to warn Babcock that the subject e-scooter was not working properly. (*See id.* at 8–9, ¶¶ 14(a)–(k).)

Lime removed the case to federal court on diversity of citizenship grounds.[1] (*See* D.E. 1 at 1–2.) A week later, Lime filed its Motion to Compel Arbitration. (D.E. 8.) Babcock filed a Response in Opposition (D.E. 14), and Lime subsequently filed its Reply memorandum (D.E. 15).

### II. LEGAL STANDARD

A motion to compel arbitration is treated as a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction. *See Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d

---

[1] The Court has diversity jurisdiction to hear this dispute under 28 U.S.C. § 1332(a) because Plaintiff Babcock is a citizen of Florida and Defendant Lime is a Delaware corporation with its principal place of business in California (*see* D.E. 1 at 1–2, ¶¶ 2–3), and because Babcock seeks $300,000 in damages (*see* D.E. 1-3 at 4).

1284, 1292 (S.D. Fla. 2017) (citing *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)). As such, the Court may consider matters outside the four corners of the Complaint. *See id.* (citing *Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1329 (S.D. Fla. 2009)). Furthermore, "a summary judgment-like standard is appropriate" when determining the existence of an arbitration agreement. *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1333 (11th Cir. 2016). Thus, the Court "may conclude as a matter of law that [the] parties did or did not enter into an arbitration agreement," but only if "there is no genuine dispute as to any material fact" concerning the agreement's formation. *Id.* (quoting Fed. R. Civ. P. 56(a)).

In ruling on a motion to compel arbitration, state law governs the interpretation and formation of the arbitration agreement; while federal law governs the enforceability of the arbitration agreement. *See Emp'rs Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001) (citing *Perry v. Thomas*, 482 U.S. 483 (1987)). Finally, under the Federal Arbitration Act, it is "a matter of federal law [that] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

### III. <u>DISCUSSION</u>

Lime asks the Court to compel arbitration under the Arbitration Provision in the User Agreement. Babcock's Opposition argues the Arbitration Provision is unenforceable under California law because she was not on "reasonable notice" of the Arbitration Provision. In its Reply, Lime argues that Babcock had "inquiry notice" of the Arbitration Provision, which is all that California law requires, and therefore Babcock's negligence claim must be arbitrated.

Before the Court can compel arbitration, Lime must meet its burden of establishing that: (1) a written agreement to arbitrate exists; (2) a nexus to interstate commerce exists; and (3) the

arbitration clause covers Babcock's claim. *See Tracfone Wireless, Inc.*, 229 F. Supp. 3d at 1293 (citation omitted).[2]

The threshold question of whether the parties entered into an agreement to arbitrate is "simply a matter of contract," *Bazemore*, 827 F.3d at 1329 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)), for which the Court applies "ordinary state-law principles that govern the formation of contracts," *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir. 2014) (quoting *Kaplan*, 514 U.S. at 944). Here, the parties agree that California law governs contract formation. (*See* D.E. 14 at 4; D.E. 15 at 2.)[3] The Court can decide whether the Arbitration Provision is enforceable only if it first finds that the parties entered into an agreement to arbitrate.

## A. **FORMATION**

The formation dispute here turns on whether Babcock assented to the Arbitration Provision. Babcock argues there is no agreement between the parties to arbitrate because she was not on "reasonable notice" of the Arbitration Provision. Lime argues there is an agreement to arbitrate because Babcock was on "inquiry notice" of the Arbitration Provision.

### 1. **California Contract Law**

A touchstone of California contract law is mutual manifestation of assent, whether by written or spoken word or by conduct. *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (citing *Binder v. Aetna Life Ins. Co.*, 75 Cal. App. 4th 832, 850 (Cal. Ct. App.

---

[2] Here, only the first element is in dispute. The parties do not challenge the interstate commerce requirement, as Babcock, while in Florida, used the Internet to contract with Lime, which is incorporated in Delaware and holds its principal place of business in California. And Babcock concedes that her negligence claim is an arbitrable issue. (*See* D.E. 14 at 9 n.3.)

[3] Section 12.23 of the User Agreement provides that "[t]his Agreement . . . will be governed by and construed in accordance with . . . the laws of the State of California, without regard to its conflicts of law provisions." (*See* D.E. 8-1 at 52, Ex. B to Decl. of Bajurin, Copy of Babcock's User Agreement with Lime.)

1999)). It is true that a party "cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) (quoting *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (Cal. Ct. App. 2001)). But it is also true that "an offeree, regardless of apparent manifestation of his consent, is not bound by *inconspicuous* contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (quoting *Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (Cal. Ct. App. 1972))) (emphasis added). Ultimately, California contract law "measures assent by an objective standard that takes into account both what the offeree . . . did and the transactional context in which the offeree . . . acted." *Id.* (quoting *Specht*, 306 F.3d at 30).

Where there is no evidence that a smartphone application user had *actual* knowledge of a contract's terms, the user is still bound by the contract if the smartphone application "puts a reasonably prudent user on *inquiry notice* of the terms of the contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) (emphasis added and citations omitted). Whether a reasonably prudent user is put on inquiry notice turns on the "[c]larity and conspicuousness of arbitration terms." *Meyer*, 868 F.3d at 75 (quoting *Specht*, 306 F.3d at 30). In the context of web-based contracts, "clarity and conspicuousness are a function of the design and content of the relevant interface." *See id.* (citing *Nicosia*, 834 F.3d at 233).

### 2. Type of Web-Based Contract

Deciding whether Babcock assented to the Arbitration Provision starts with determining where the User Agreement falls among the variations of web-based contracts. *See id.* at 76 ("Insofar as it turns on the reasonableness of notice, the enforceability of a web-based agreement

is clearly a fact-intensive inquiry.") (citation omitted). Types of web-based contracts include "browsewraps," "clickwraps," "scrollwraps," and "sign-in-wraps." *See Selden v. Airbnb, Inc.*, Case No. 16-cv-00933, 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016) (citing *Nguyen*, 763 F.3d at 1175–77; *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 366–67 (E.D.N.Y 2015)).[4] Although the parties' briefing does not clearly establish what type of "wrap agreement" the Lime User Agreement is, the Court finds that it best fits into the "sign-in wrap" category.

"Sign-in wraps" are agreements where a user signs up to use an internet product or service, and the sign-up screen states that "acceptance of a separate agreement is required before the user can access the service." *Id.* at *4. While a link to the separate agreement is provided, the user is "not required to indicate that they have read the agreement's terms before signing up." *Id.* (citations omitted). As outlined above, to rent a Lime e-scooter, the Lime sign-up page requires a user to tap the "I Agree" button; and the Lime sign-up screen unambiguously explains that "[b]y tapping 'I Agree'" the user confirms that he or she has "read and agreed to Lime's User Agreement." *See supra* Sec.I.B. Because the user accepts the terms of Lime's User Agreement—which are accessible through the blue boldface hyperlink on the sign-up page—by tapping "I Agree" immediately before being permitted to use the service, the Court finds that the User Agreement is best characterized as a "sign-in wrap" agreement. *See also Phillips v. Neutron Holdings, Inc.*, Case No. 3:18-CV-3382-S, 2019 WL 4861435, at *4 (N.D. Tex. Oct. 2, 2019) (finding Lime's User Agreement a "sign-in-wrap" agreement).

---

[4] For extra context, a "browsewrap" is an agreement where the user accepts a website's terms of use merely by browsing the site. *See Selden*, 2016 WL 6476934, at *4. A "clickwrap" is an agreement where the user accepts a website's terms of use by clicking an "I agree" or "I accept" button, with a link to the agreement readily available. *Id.* And a "scrollwrap" is an agreement, like a "clickwrap" agreement, but the user is presented with the entire agreement and must physically scroll to the bottom of the agreement to find the "I agree" or "I accept" button. *Id.*

### 3. **Inquiry Notice**[5]

The Court must now decide whether Babcock had "inquiry notice" of the Arbitration Provision by virtue of the blue boldface hyperlink to the User Agreement's terms—which appeared directly above the "I Agree" button, which, by tapping, Babcock confirmed that she "read and agreed to Lime's User Agreement." (D.E. 8-1 at 7, Ex. A to Decl. of Bajurin.)

Regardless of Babcock's apparent manifestation of assent, she is "not bound by inconspicuous contractual provisions" of which she was "unaware" and that were "contained in a document whose contractual nature [was] not obvious." *Meyer*, 868 F.3d at 74 (quoting *Specht*, 306 F.3d at 30 (quoting *Windsor Mills, Inc.*, 25 Cal. App. 3d at 993)). In assessing the conspicuousness of the Arbitration Provision, the Court must heed "precedent and basic principles of contract law," which require considering "the perspective of a reasonably prudent smartphone user." *Id.* at 77–78 (citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 124 (2d Cir. 2012)).

Across the country, consumers use their smartphones every day to follow the news, to shop, to online bank, to research health conditions, to play games, and to participate on social networking platforms. Consumers also routinely use smartphone applications for ride-hailing services like Uber and Lyft; and more recently, consumers are using applications for other mobility services, such as to rent e-bicycles and e-scooters through companies like Lime. In short, contracting for services on smartphone applications is now commonplace in the American economy. Thus, "[a]ny reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider." *Selden*, 2016 WL 6476934, at *5. Although "few people may take time to actually read the user

---

[5] The parties do not dispute whether Babcock had "actual" notice of the Arbitration Provision. (*See* D.E. 14 at 5–6; D.E. 15 at 3.) Thus, the Court must determine whether Babcock had inquiry notice.

agreements . . . ignorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up for internet-based services." *Id.* The Lime App is no exception.

Here, the Court finds that the blue boldface hyperlink to the User Agreement's terms (where the user could read the full Arbitration Provision), combined with the unambiguous warning that "[b]y tapping 'I Agree,'" the user confirms that he or she "read and agreed to Lime's User Agreement," is conspicuous enough to put a reasonably prudent smartphone user on inquiry notice of the Arbitration Provision.

The first two words that appear on the Lime App sign-up page are: "User Agreement." (*See* D.E. 8-1 at 7, Ex. A to Decl. of Bajurin, Image of Sign-Up Screen).[6] The words are conveniently shown at the page's center, in large black boldface font; the words are also larger than any other word on the page. *Id.*

Immediately below the large "User Agreement" title, albeit in comparatively smaller black font, the only full sentence on the entire sign-up page explains to the user that: "By tapping 'I Agree', I confirm that I am at least 18 years old or other legal age of majority, and that I have read and agreed to Lime's **User Agreement** and that I have read **Privacy Note**." *Id.* (blue boldface in original). In this sentence, only the words "User Agreement" and "Privacy Note" appear in blue boldface font; these words are the only words in blue font on the entire page. *Id.* The blue boldface font signifies that the words are hyperlinks to information located on another page.[7] By tapping

---

[6] The full image appears on the next page.
[7] The Court agrees with the Second Circuit that "a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found." *Meyer*, 868 F.3d at 78–79 ("As long as the hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent smartphone user would have constructive notice of the terms."). Even though the "User Agreement" hyperlink on Lime's sign-up page is not underlined, the hyperlink appearing in blue boldface font stands out from the only other font on the page, which is black and white. The mere lack of an underline does not materially change the Court's analysis, such that a different result is compelled.

the blue boldface "User Agreement" hyperlink, the user is taken to a separate webpage containing the full terms of the User Agreement.

Next, the words "I Agree" in the User Agreement acknowledgement refer to the "I Agree" confirmation button located at the bottom of the page. This "I Agree" appears in white font and is surrounded by a lime-green rounded-rectangle. An empty white space separates the lime-green "I Agree" button from the blue boldface "User Agreement" hyperlink. Only by tapping the lime-green "I Agree" confirmation button can the user assent to the User Agreement's terms.



Taken together, the large black boldface User Agreement title, the non-bold black User Agreement acknowledgement, the blue boldface User Agreement hyperlink, and the lime-green "I Agree" confirmation button create a user friendly display. The assortment of contrasting colors, and bold and non-bold fonts, combine with empty white space to visually separate each piece of information so that the user clearly understands that by tapping "I Agree," he or she is agreeing to be bound by the User Agreement's terms, which are readily accessible by tapping on the blue boldface hyperlink.

If the user taps the "User Agreement" hyperlink, the first sentence of the first substantive paragraph instructs the user to carefully read the User Agreement and notifies the user that he or she is bound by the terms of the User Agreement:

> **PLEASE READ EACH PROVISION OF THIS AGREEMENT CAREFULLY. IT SETS FORTH THE LEGALLY BINDING TERMS AND CONDITIONS FOR YOUR USE OF THE SERVICES (DEFINED BELOW). BY ACCESSING AND/OR USING OUR SERVICES, YOU AGREE TO BE**

**LEGALLY BOUND BY THIS AGREEMENT**.

(D.E. 8-1 at 9, Ex. B to Decl. of Bajurin, Copy of Babcock's User Agreement with Lime (boldface and caps in original).) The next sentence further warns the user to forgo using the service if the user does not agree with the Arbitration Provision:

> **IF YOU DO NOT AGREE TO THIS AGREEMENT AND THE CONDITIONS OF USE STATED HEREIN, INCLUDING THE ARBITRATION . . . PROVISION[], DO NOT USE THE SERVICES**.

(*Id.* (boldface and caps in original).) If the precise terms matter to the user, then the user can read the full Arbitration Provision, which unambiguously explains that all disputes must be arbitrated:

> **2.3 <u>Binding Arbitration</u>: . . . ANY AND ALL DISPUTES . . . MUST BE RESOLVED BY FINAL AND BINDING ARBITRATION. . . . BY AGREEING TO ARBITRATE, EACH PARTY IS GIVING UP ITS RIGHT TO GO TO COURT AND HAVE ANY DISPUTE HEARD BY A JUDGE OR JURY.**

(*Id.* at 22 (boldface, underline, and caps in original).)

In short, even though the full Arbitration Provision is in Section 2.3 of the User Agreement, the sign-up screen *conspicuously* displays the hyperlink to the full terms of the User Agreement and *unambiguously* explains the significance of tapping "I Agree." And if the user simply taps on the blue boldface hyperlink, the first substantive paragraph instructs the user to carefully read the terms, notifies the user that he or she is bound by the terms, and clearly warns the user *not to agree* to the terms if the user does not agree with the Arbitration Provision. It bears reminding that a party "cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." *Norcia*, 845 F.3d at 1284 (quoting *Marin Storage & Trucking, Inc.*, 89 Cal. App. 4th at 1049). For all these reasons, the Court finds that the Lime App sign-up screen would put a reasonably prudent smartphone user on inquiry notice of the terms of the User Agreement, including the Arbitration Provision.

This finding is consistent with similar challenges to "sign-in wrap" agreements around the country. Notable standouts include two cases from federal district courts in Texas that involved the same challenge to Lime's User Agreement. Both cases reached the same conclusion: Lime's "sign-up wrap" agreement would put a reasonably prudent person on notice of the User Agreement. In *Phillips v. Neutron Holdings, Inc.*, the court granted Lime's motion to compel arbitration after finding that the "hyperlink to the User Agreement on Lime's sign-up screen was reasonably conspicuous and placed [the plaintiff] on notice of the User Agreement." 2019 WL 4861435, at *5–6. Although the *Phillips* court applied Texas contract law, despite the California choice-of-law provision in Lime's User Agreement, it did so because the parties did not address the choice-of-law issue in their briefing. *See id.* at *3 n.1. In any event, the *Phillips* court explained that California contract law is "substantially the same" as Texas contract law, and so applying California law "to the limited issue of whether [the plaintiff] entered into an agreement that contained an arbitration agreement would not alter the analysis or result." *Id.* (citations omitted).[8]

In addition to the Texas cases involving Lime, several federal district courts have, applying California contract law, found that "sign-in wrap" agreements like Lime's agreement provide consumers with sufficient notice of arbitration provisions. *See Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541, 544, 548–49 (W.D. Tex. 2017) (applying California law and ruling "sign-in wrap" agreement "put a reasonable user on notice of the terms of the Agreement" where the plaintiff was informed on the final screen of the account registration process that "[b]y creating an Uber account,

---

[8] The other case finding that Lime's "sign-up wrap" gives enough notice is *Walker v. Neutron Holdings, Inc.*, Case No. 1:19-CV-574-RP, 2020 WL 703268, at *4 (W.D. Tex. Feb. 11, 2020). There, the report and recommendation recommended that the district court compel arbitration after finding "the Lime App gave [the plaintiff] adequate notice of the User Agreement" because "a reasonable user would view the Lime App sign-in screen and see that the User Agreement is part of the offer to proceed with the transaction." *Id.* Although the district court has not yet ruled on the report and recommendation, no objections were filed within the allowed time.

you agree to the Terms of Service"); *Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988–91 (N.D. Cal. 2017) (applying same and ruling same where plaintiff had to "affirmatively assent to Uber's terms and conditions by clicking 'DONE' to complete his sign-up process on a page clearly displaying the notice: 'By creating an Uber account, you agree to the Terms & Conditions'"); *Selden*, 2016 WL 6476934, at *4–5 & n.1 (applying same and ruling same where the text "By signing up, I agree to Airbnb's Terms of Service" was conspicuously placed near middle of page, in close proximity to all sign-up buttons, and "any reasonably-observant user would notice the text and accompanying hyperlinks").[9]

In sum, the Court finds that Babcock was on inquiry notice of the User Agreement's terms, and thus on inquiry notice of the Arbitration Provision. Therefore, the Court finds that the parties entered into a valid agreement to arbitrate all claims arising from the User Agreement. With this established, the Court can now address whether the Arbitration Provision is enforceable.

**B.      ENFORCEABILITY**

Lime argues that the Delegation Clause in the User Agreement reserves sole jurisdiction to the arbitrator to decide the enforceability of the Arbitration Provision. Babcock urges that this Court can decide questions of arbitrability "since [she] is specifically challenging the validity of the arbitration agreement itself." (D.E. 14 at 9.)

The User Agreement makes clear that the Federal Arbitration Act, "not state law, shall

---

[9] Another court applying Virginia contract law found that a similar "sign-in wrap" agreement gave the user sufficient notice of the terms and conditions. *See Melo v. Zumper, Inc.*, Case No. 3:19CV621 (DJN), --- F. Supp. 3d ---, 2020 WL 465033, at *11 (E.D. Va. Jan. 28, 2020) (applying Virginia law and ruling plaintiff had sufficient notice of terms and conditions where "*[d]irectly* below the 'Create Account' button, the popup window displayed an acceptance statement that read: 'By creating a Zumper Account you indicate your acceptance to our Terms and Conditions'" and the phrase "'Terms and Conditions' appeared in blue, indicating that Plaintiff could click a hyperlink to thoroughly read the Agreement") (emphasis in original).

govern the arbitrability of all Disputes regarding this Agreement." (D.E. 8-1 at 22 Ex. B to Decl. of Bajurin, Copy of Babcock's User Agreement with Lime.) Under the Federal Arbitration Act, arbitration agreements exist on equal footing with all other contracts and there is a clear presumption—a "national policy"—in favor of arbitration. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). Federal law governs the enforceability of arbitration agreements. *See Emp'rs Ins. of Wausau*, 251 F.3d at 1322 (citing *Perry*, 482 U.S. 483). Under federal law, "parties may agree to commit even threshold determinations to an arbitrator, such as whether an arbitration agreement is enforceable." *Parnell v. CashCall, Inc.*, 804 F.3d 1142, 1146 (11th Cir. 2015). The Supreme Court has upheld these so-called "delegation provisions" as valid and explained that they are severable from an underlying arbitration provision. *Id.* (citing *Rent–A–Center*, *West, Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010); *Buckeye*, 546 U.S. at 445).

The User Agreement here includes a Delegation Clause, which provides that "[a]ll issues are for the arbitrator to decide, including arbitrability." (D.E. 8 at 23, Ex. B to Decl. of Bajurin, Copy of Babcock's User Agreement with Lime.) To overcome this Delegation Clause and allow the Court to determine arbitrability, Babcock must "challenge[] the delegation provision *specifically*." *Id.* (quoting *Rent–A–Center*, 561 U.S. at 72) (emphasis in original). If, on the other hand, Babcock challenges "the contract *as a whole*," then the Court "may not review [the] claim because it has been committed to the power of the arbitrator." *Id.* (emphasis in original). Absent a challenge to the Delegation Clause itself, the Court must, under the Federal Arbitration Act, treat the Delegation Clause "as valid" and "enforce it," thereby "leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *Id.* at 1147.

Here, Babcock does not specifically challenge the Delegation Clause. First off, the Complaint never references the User Agreement or the Arbitration Provision—let alone the

- 15 -

Delegation Clause. (*See* D.E. 1-2 at 6–10.) And worse off, Babcock's Opposition memorandum makes clear that she is "specifically challenging the validity of the arbitration agreement itself." (D.E. 14 at 9.) This assertion is self-defeating. *See Parnell*, 804 F.3d at 1149 (reversing denial of motion to compel arbitration, where applicable contract had delegation provision, because plaintiff asked court "to review the validity of the arbitration agreement as a whole, a task which the delegation provision expressly commit[ted] to an arbitrator").

Put simply, because Babcock does not, at any point in her Complaint or Opposition, "specifically challenge the parties' agreement *to commit to arbitration* the question of the enforceability of the arbitration agreement," the Federal Arbitration Act compels this Court to treat the Delegation Clause as valid and enforce the User Agreement by its terms. *Id.* (emphasis in original). Therefore, the Court finds that issues regarding the enforceability of the arbitration provision are committed to the arbitrator. *Id.*; *see also Phillips*, 2019 WL 4861435, at *5–6 (granting Lime's motion to compel arbitration where delegation clause, incorporating JAMS rules, provided that "[j]urisdictional and arbitrability disputes . . . shall be submitted to and ruled on by the Arbitrator"). Accordingly, Lime's Motion to Compel Arbitration is **GRANTED**.[10]

### IV. CONCLUSION

For all these reasons, it is

**ADJUDGED** that Lime's Motion to Compel Arbitration (**D.E. 8**) is **GRANTED**. The parties are **COMPELLED** to proceed with arbitration pursuant to the terms of the User Agreement. Accordingly, the Motion to Dismiss for Improper Venue and for Failure to State a Claim is **DENIED AS MOOT**. It is further

---

[10] Because the User Agreement requires this Court to compel arbitration, the Court need not address Lime's remaining arguments for dismissal on improper venue and Rule 12(b)(6) grounds. Accordingly, the Motion to Dismiss on these grounds is **DENIED AS MOOT**.

**ADJUDGED** that the:

**(1)** The Clerk mark this cause **CLOSED** for statistical purposes and place the matter in the civil suspense file;

**(2)** The Court will retain jurisdiction and the case shall be restored to the active docket upon motion of a party if circumstances change so that this action may proceed to final disposition;

**(3)** This Order will not prejudice the rights of the parties to this litigation; and

**(4)** Plaintiff must notify the Court by **July 30, 2020**, and every three (3) months thereafter of the status of the proceedings and when this action is ready to proceed.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 13th of April 2020.

*/s/ Federico A. Moreno*

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record